[L. A. No. 15836. In Bank.—July 28, 1938.]

WHOLESALE TOBACCO DEALERS BUREAU OF SOUTHERN CALIFORNIA, INCORPORATED (a California Nonprofit Corporation), Respondent, v. NATIONAL CANDY AND TOBACCO CO. (a California Corporation), Appellant.

638

Abe Richman for Appellant.

J. Wesley Cupp and Cupp & Cupp for Respondent.

Landels, Weigel & Crocker, E. R. Hoerchner, Sheldon D. Elliott, Paul R. Hutchinson, J. Hart Dasteel and Leo H. Shapiro, as *Amici Curiae*, on Behalf of Respondent.

WASTE, C. J.—Defendant appeals from a judgment enjoining it: (1) from selling, or offering or advertising for sale its products at less than invoice or replacement cost, whichever is lower, plus its cost of doing business; (2) from discriminating as to price between different sections, communities or cities by selling its products to customers at a lower rate in one section, community or city than in another, after making proper allowance for grade, quality, quantity and costs of transportation; and (3) from secretly paying or

allowing rebates, refunds, commissions or unearned discounts, whether in the form of money or otherwise, to certain customers, not extended to all purchasers purchasing upon like terms and conditions, whether used to cover up sales below cost and discrimination between localities, or otherwise. It is admitted that appellant committed all of the acts enjoined, and that the commission of said acts was in express violation of the provisions of the Unfair Practices Act as amended in 1935 (Stats. 1935, p. 1546; Deering, Codes, Laws and Constitutional Amendments, 1935 Supp., p. 2063, Act 8781). The sole question presented on this appeal has to do with the constitutionality of certain sections of the 1935 amendments as applied to the facts of this case. It is appellant's contention that the challenged amendments are unconstitutional in that they violate article I, sections 1, 11, 14 and 21, and article XII, sections 22 and 23 of the California Constitution and section 1 of the Fourteenth Amendment to the federal Constitution. It is also contended that section 3 of the act, in so far as it defines the cost of doing business, is void for the reason that it is uncertain and unintelligible.

The judgment, in so far as it enjoins appellant from discriminating as to price between different sections, and from giving secret rebates, is not challenged. Appellant centers its entire attack on that portion of the judgment enjoining it from selling its products below cost or replacement cost (whichever is lower) plus the cost of doing business as defined in the act.

The trial court held the statute constitutional, and, upon the admission of appellant that it had committed the challenged acts, entered its judgment accordingly. Another department of the Superior Court of Los Angeles County has held the statute unconstitutional in *Balzer* v. *Caler*, L. A. No. 15859, now on appeal to this court. (See *post*, p. 663 [82 Pac. (2d) 19].)

It should also be mentioned that the statute has been upheld as constitutional by the appellate department of the Superior Court of Los Angeles County in *People* v. *Kahn*, 19 Cal. App. (2d) (Supp.) 758 [60 Pac. (2d) 596]. The Supreme Court of Tennessee has recently (March 7, 1938) upheld the constitutionality of the Tennessee Unfair Sales Act (Tenn. Code Ann.; Williams, Supp. 1937), which is comparable in its essential features to the act here under attack. (*Rust* v. *Griggs*, (Tenn.) 113 S. W. (2d) 733.)

The present cause was tried upon an agreed statement of facts. So far as the charge that appellant sold its products below cost as defined in the act is concerned, it appears therefrom, that the cost of doing business in the line of activity in which appellant is engaged is an established fact well known to all engaged in the industry, including appellant; that in such business the lowest possible cost of doing business is 3 per cent above net cost; that appellant's cost of doing business is at least 3 per cent above net cost; that respondent is an incorporated trade association composed of twenty members engaged in the wholesale tobacco industry in southern California; that appellant is a member of this association; that several of appellant's competitors, also members of respondent association, had for one of their customers the county of Los Angeles to whom they have been selling their products at net cost plus 3 per cent; that appellant knew this fact; *that in order to secure this business for itself, and to injure its competitors,* appellant, on certain specified days offered to sell and subsequently sold certain of its products to the county of Los Angeles at net cost plus 1 per cent; that in so doing appellant was fully aware that the price at which it was selling these products was below its cost price as defined in the Unfair Practices Act; that these sales were not made by appellant at a loss under any of the circumstances permitted by the act, but were made to secure this customer for itself, *to injure its competitors, and for the purpose of preventing others from becoming dealers in such products in competition with appellant.*

█ The Unfair Practices Act as amended in 1935 was adopted as an urgency measure. Section 1 prohibits merchants, manufacturers, producers and distributors, with intent to destroy competition or to prevent competition of any new dealer, from discriminating as to price between different sections, communities or cities, and likewise prohibits the giving of special rebates or the use of any other device to accomplish this result. This portion of the act, although reenacted in 1935, has been an integral part of our law since 1913 when the original Unfair Practices Act was adopted. (Stats. 1913, p. 508.) It is predicated upon a similar statute first adopted in South Dakota. The constitutionality of such provision is beyond question. (*State* v. *Central Lumber Co.,* 24 S. D. 136 [123 N. W. 504, 42 L. R. A. (N. S.) 804];

*Central Lumber Co.* v. *South Dakota,* 226 U. S. 157 [33 Sup. Ct. 66, 57 L. Ed. 164].)

Section 3 of the act is the provision against which the main attack of appellant is directed. It provides:

"Sec. 3. *Sales at less than cost.* It shall be unlawful for any person, partnership, firm, corporation, joint stock company, or other association engaged in business within this State, to sell, offer for sale or advertise for sale any article or product, or service or output of a service trade, at less than the cost thereof to such vendor, or give, offer to give or advertise the intent to give away any article or product, or service or output of a service trade for the purpose of injuring competitors and destroying competition, and he or it shall also be guilty of a misdemeanor, and on conviction thereof shall be subject to the penalties set out in section 11 of this act for any such act.

"*Definitions.* The term 'cost' as applied to production is hereby defined as including the cost of raw materials, labor and all overhead expenses of the producer; and as applied to distribution 'cost' shall mean the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor plus the cost of doing business by said distributor and vendor.

"The 'cost of doing business' or 'overhead expense' is defined as all costs of doing business incurred in the conduct of such business and must include without limitation the following items of expense: labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising."

Section 4 prohibits the seller, in establishing his cost of an article at less than present replacement cost from using the invoice cost paid by him at a forced, bankrupt, closeout sale, or other sale outside of the ordinary channels of trade, unless the article so purchased is kept separate from goods purchased in the ordinary channels of trade, and unless said article is advertised and sold as merchandise purchased at a forced, bankrupt, or closeout sale.

Section 5 permits the use of cost surveys in proving the cost of an article in any proceeding under the act.

Section 6 is the section which permits sales at less than cost under any of the following circumstances:

(a) In closing out in good faith the owner's stock or any part thereof for the purpose of discontinuing his trade in that article, or the sale of seasonal or perishable goods to prevent loss by spoilage or depreciation, provided notice is given to the public thereof;

(b) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof;

(c) By an officer acting under the orders of any court;

(d) "In an endeavor made in good faith to meet the legal prices of a competitor . . . selling the same article or product . . . in the same locality or trade area."

Section 7 declares that the secret payment or allowance of rebates in any form not offered to all purchasers purchasing upon like terms and conditions "to the injury of a competitor and where such payment or allowance tends to destroy competition, is an unfair trade practice" and any person resorting to the same is guilty of a misdemeanor.

Section 8 declares that it is the duty of the attorney-general, upon the third violation of the act by any corporation, to institute *quo warranto* proceedings for the forfeiture of the charter of any such corporation.

Section 9 provides that any contract made in violation of the act is illegal, and no recovery thereon shall be had.

Section 10 authorizes any person, corporation or trade association to maintain an action to enjoin a continuance of acts in violation of the statute, and if injured thereby to recover three times the actual damages sustained.

Section 11 makes violation of sections 1 to 7 a misdemeanor, while section 12 contains the usual severability clause.

Section 13 should be quoted. It provides:

"The Legislature declares that the purpose of this act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. This act shall be literally construed that its beneficial purposes may be subserved."

Section 14 provides that the act shall be known as the "Unfair Practices Act".

Section 15 declares the act to be an urgency measure. It provides:

"This act is hereby declared to be an urgency measure necessary for the immediate preservation of the public peace,

health and safety, within the meaning of section 1 of article IV of the Constitution, and shall therefore go into immediate effect. The facts constituting the necessity are as follows:

"The sale at less than cost of goods obtained at forced, bankrupted, close out, and other sales outside of the ordinary channels of trade is destroying healthy competition and thereby forestalling recovery. If such practices are not immediately stopped many more businesses will be forced into bankruptcy, thus increasing the prevailing condition of depression. In order to prevent such occurrences it is necessary that this act go into effect immediately."

█ This act represents an attempt on the part of the legislature to regulate business as a whole by prohibiting practices which the legislature has determined constitute unfair trade practices. Its stated purpose (sec. 13) is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage free, open and fair competition. So far as the present case is concerned, the practice prohibited by the statute is selling below cost. As will later appear this practice is only prohibited when performed "for the purposes of injuring competitors and destroying competition".

It is manifest that the statute was passed in the attempted exercise of the state's police power. That being so, the inquiry of this court is limited to determining whether the object of the statute is one for which the police power may legitimately be invoked, and, if so, whether the statute bears a reasonable and substantial relation to the object sought to be attained. These two problems involve substantially different considerations, and shall be separately discussed.

That the avowed purpose of the act as stated in section 13 . . . "to safeguard the public against the creation of perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented" —is well within the state's police power cannot be seriously doubted. █ It has now become firmly established that the police power of the state extends not only to the preservation of the public health, safety and morals, but also extends to the preservation and promotion of the public welfare. In recent years the state, in promoting and advancing the general welfare of its citizens, has frequently and properly used this power to promote the general prosperity of the state by

the regulation of economic conditions. This apparent extension of the police power is in fact no extension at all. The police power has not expanded. Its proper exercise has always been and still is confined to regulation in the public welfare, and has always been and still is subject to the standard of reasonableness in its relation to that interest. However, changed social, political and economic conditions have enlarged the field of conduct which may properly be subjected to regulation in order that the general welfare may be adequately protected. The proper application of the power cannot be measured by past precedents—the test is, of course, present day conditions. These principles have frequently been enunciated by this court and by the Supreme Court of the United States. In *Miller* v. *Board of Public Works*, 195 Cal. 477, 484 [234 Pac. 381, 38 A. L. R. 1479], they are summarized as follows:

''The police power of a state is an indispensable prerogative of sovereignty and one that is not to be lightly limited. Indeed, even though at times its operation may seem harsh, the imperative necessity for its existence precludes any limitation upon its exercise save that it be not unreasonably and arbitrarily invoked and applied . . . In short, the police power, as such, is not confined within the narrow circumspection of precedents, resting upon past conditions which do not cover and control present-day conditions obviously calling for revised regulations to promote the health, safety, morals, or general welfare of the public. That is to say, as a commonwealth develops politically, economically and socially, the police power likewise develops, within reason, to meet the changed and changing conditions. What was at one time regarded as an improper exercise of the police power may now, because of changed living conditions, be recognized as a legitimate exercise of that power. . . .

''Thus it is apparent that the police power is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life, and thereby keep pace with the social, economic, moral and intellectual evolution of the human race. . . . ''

In *People* v. *Associated Oil Co.*, 211 Cal. 93, 98 [294 Pac. 717], this court stated: ''But there is no longer any doubt that this general rule has been extended so as to include meas-

ures which relate to the general welfare. In the case of *Chicago B. & O. Ry.* v. *Illinois,* 200 U. S. 561 [26 Sup. Ct. 341, 59 L. Ed. 596, 4 Ann. Cas. 1175], the Supreme Court stated at page 592: 'We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals, or the public safety' . . . If the question between the taking of private property and a proper exercise of the police power is fairly debatable, the statute will be upheld (citing cases). Also where a strong and preponderant opinion prevails in the state that a particular measure is greatly and immediately necessary to the public welfare, that factor has an important influence in establishing the limitations of the police power in a particular case . . . ''

In *Graham* v. *Kingwell,* 218 Cal. 658, 659 [24 Pac. (2d) 488], this court stated: ''In the exercise of its police power the state may prescribe regulations tending to promote the public health, safety, morals and welfare of the people. It may also legislate so as to increase the industries of the state, develop its resources and promote its welfare and prosperity.''

In *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 442 [54 Sup. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481], the United States Supreme Court stated:

''It is manifest from this review of our decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for rational compromise between individual rights and public welfare. The settlement and consequent contraction of the public domain, the pressure of a constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests, have inevitably led to the increased use of the organization of society in order to protect the very bases of individual opportunity. Where, in earlier days, it was thought that only the concerns of individuals or classes were involved, and that those of the state itself were touched only remotely, it has later been found that the fundamental interests of the state are directly affected; and that the question is no longer merely that of one party to a contract as against another, *but of the use of reasonable means to safeguard the economic structure upon which the good of all depends.''* (Italics ours.)

With these cases, and many others that could be cited, in mind, it is obvious that the object of the present statute is within the state's police power. That the prevention of monopolies and the fostering of free, open and fair competition and the prohibition of unfair trade practices is in the public welfare is obvious, and requires no further citation of authority. In fact this is not seriously challenged by appellant. The main arguments advanced by appellant are that the act is unconstitutional in that it curtails its previously enjoyed privilege or right of fixing the price at which it is willing to sell its goods, and of selling them at such prices, and that the act unlawfully deprives it of its freedom of action; that it is unreasonable and will not accomplish the purposes intended. These contentions go to the reasonableness of the statute in its relation to its avowed object, and do not attack the validity of that object.

So far as pertinent here, the present act prohibits the sale of commodities below cost as defined in the act (with certain enumerated exceptions) but, as will later appear, such sale is only prohibited when engaged in ''for the purpose of injuring competitors and destroying competition''. In determining the validity of this provision (the object of the statute being within the police power of the state) we are limited in our inquiry to determining whether the act is one reasonably connected with its avowed purpose. In other words, are the means adopted reasonably designed to accomplish this purpose; do they have a real and substantial relation to the objects sought to be attained?

In passing on these questions there are two fundamental principles which must be kept in mind:

In the first place, mere sincerity or honesty of purpose on the part of the legislature does not alone justify the statute. The declaration in the statute as to its purposes, does not determine whether the means provided in the statute are reasonably designed to accomplish those purposes. The courts may properly inquire into that subject.

In the second place, in determining whether the means provided in the statute are reasonably designed to accomplish its avowed object, if that question is reasonably debatable, the determination of the legislature is conclusive. It is not for the courts, except within the limits herein set forth, to determine whether or not the policy of a statute is economically sound or beneficial. That is a matter solely for the legisla-

ture. These principles have recently been discussed at length by this court in *Max Factor & Co.* v. *Kunsman,* 5 Cal. (2d) 446 [55 Pac. (2d) 177], affirmed by the United States Supreme Court, 299 U. S. 198 [57 Sup. Ct. 147, 81 L. Ed. 122], a case involving the validity of the Fair Trade Act as amended in 1933 (Stats. 1933, p. 793). That statute permitted the owner of trademarked goods to fix the resale price of his commodity, and such price so fixed was made binding on all into whose hands such goods should fall as provided in the act. In that case (p. 454) it is stated: ''In the first place, this court has neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature. We recognize that economic and juridical thought is, and for many years has been, divided on the economic question as to the benefits to the consuming public of free and open competition, and its necessary corollary, price cutting.'' After pointing out that one school of economic thought was of the opinion that from a social standpoint, free and open competition was desirable, while another school of thought believed that from a social standpoint the owner of a trademarked article should be permitted to fix the resale price of such article, and after discussing the basis of each argument, this court continued (p. 455): ''By the enactment of the Fair Trade Act in 1931, as amended in 1933, the state legislature, for reasons known to it and which we must presume were sufficient, has seen fit to attempt to change its former policy, and to adopt the second economic concept above discussed. In so far as the statute involves a mere change in the economic policy of the state, this court has no power or right to interfere. The members of the court may or may not agree with the economic philosophy of the Fair Trade Act, but it is no part of the duty of this court to determine whether the policy embodied in the statute is wise or unwise. It is primarily a legislative and not a judicial function to determine economic policy. The power of the court is limited to determining whether the subject of the legislation is within the state's power, and if so to determine whether the means adopted to accomplish the result are reasonably designed for that purpose, and have a real and substantial relation to the objects sought to be attained. These principles have frequently been stated by the United States Supreme Court. In the recent case of *Nebbia* v. *New York,* 291 U. S. 502, at page 537 [54 Sup. Ct. 505 78 L. Ed. 940, 89

A. L. R. 1469], Mr. Justice Roberts, speaking for the majority of the court, said:

" 'So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio.* "Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.'' (*Northern Securities Co.* v. *United States,* 193 U. S. 197, 337, 338 [24 Sup. Ct. 436, 48 L. Ed. 679].) And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.

" 'The law-making bodies have in the past endeavored to promote free competition by laws aimed at trust and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimim prices, that expedient has been sustained. If the law-making body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to

cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.'

"In *Central Lumber Co.* v. *South Dakota*, 226 U. S. 157, 160 [33 Sup. Ct. 66, 57 L. Ed. 164], Mr. Justice Holmes stated:

" 'If the legislature shares the now prevailing belief as to what is public policy and finds that a particular instrument of trade war is being used against that policy in certain cases, it may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed.' "

In *Old Dearborn D. Co.* v. *Seagram Distiller's Corp.*, 299 U. S. 183 [57 Sup. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476], in upholding the validity of the Illinois Fair Trade Act (identical in substance with the California act involved in the Max Factor case, *supra*), the United States Supreme Court stated (p. 195):

"There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and business of the producer and distributor of identified goods, but injurious to the general public as well. The evidence to that effect is voluminous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True, there is evidence, opinion and argument to the contrary; but it does not concern us to determine where the weight lies. We need say no more than that the question may be regarded as fairly open to differences of opinion. The legislation here in question proceeds upon the

former and not the latter view; and the legislative determination in that respect, in the circumstances here disclosed, is conclusive so far as this court is concerned. Where the question of what the facts establish is a fairly-debatable one, we accept and carry into effect the opinion of the Legislature.''

See, also, *Pacific States Box & Basket Co.* v. *White*, 296 U. S. 176 [56 Sup. Ct. 159, 80 L. Ed. 138, 101 A. L. R. 853]; *Fox* v. *Standard Oil Co.*, 294 U. S. 87 [55 Sup. Ct. 333, 79 L. Ed. 780]; *Central Lumber Co.* v. *South Dakota*, 226 U. S. 157 [33 Sup. Ct. 66, 57 L. Ed. 164]; *Purity Extract & T. Co.* v. *Lynch*, 226 U. S. 192 [33 Sup. Ct. 44, 57 L. Ed. 184].

In discussing the question as to whether the statute is reasonably designed to accomplish its avowed purposes, the parties, and various *amici curiae* on their behalf have written many briefs covering a wide field of discussion. On behalf of appellant it is urged that the means adopted by this statute—prohibiting sales below cost—cannot possibly prevent the creation of monopolies and will not foster free, open and fair competition. It is contended that this legislation in fact will stifle free and open competition and will foster monopolies and that it favors the large chain stores and large distributors as against the small merchant. On behalf of respondent the contrary is urged. It should be noted that *amici curiae* briefs have been filed on behalf of respondent by several of the trade associations representing the independent grocers and druggists of the state.

It is not the province of this court to determine where the truth of this argument lies. If the subject is fairly debatable the determination of the legislature is conclusive. That the economic wisdom of such legislation is fairly debatable cannot be gainsaid. Courts have · frequently commented on the destructiveness of price-cutting tactics. (*Nebbia* v. *New York*, supra; *Hegeman Farms Corp.* v. *Baldwin*, 293 U. S. 163 [55 Sup. Ct. 7, 79 L. Ed. 259]; *Highland Farms Dairy* v. *Agnew*, 300 U. S. 608 [57 Sup. Ct. 549, 81 L. Ed. 835]; *Max Factor & Co.* v. *Kunsman, supra; Agricultural Prorate Com.* v. *Superior Court*, 5 Cal. (2d) 550 [55 Pac. (2d) 495].) The use of ''loss leaders'' for the purpose of injuring a competitor has been condemned by many economists. It has been urged that their use is injurious to the consumer in that the losses so sustained will either have to be made up by higher prices charged on other commodities, or by the enforcing of various economies, such as the lowering of wages,

discharge of employees, lowering of rents, depressing the wholesale prices, etc. It has many times been urged that such practices are destructive of competition and tend to create monopolies (see discussion in *State* v. *Central Lumber Co.*, *supra*, and *Central Lumber Co.* v. *South Dakota, supra*). These arguments are mentioned not because we necessarily believe that they are sound, but to demonstrate that the practice condemned by this statute, according to the views held by a large portion of the body politic, tends toward the stifling of free and open competition, the creation of monopolies, and is injurious to the consuming public. It should also be mentioned that some 14 states have passed similar legislation. This is entitled to some weight in determining whether the means provided in the statute will tend to accomplish the valid and expressed purpose of the legislature.

Appellant, and *amici curiae* on its behalf, urge that, except as to businesses affected with a public interest, the owner of an article has the constitutional right to sell his property at any price he may desire; that the statute is a price fixing statute; that price fixing statutes, except as to businesses affected with a public interest are *per se* unconstitutional; that the statute unlawfully interferes with its freedom of contract and unlawfully interferes with its freedom of action. Appellant relies on such cases as *Wolff Packing Co.* v. *Court of Industrial Relations*, 262 U. S. 522 [43 Sup. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280]; *Tyson & Bro. Ticket Offices* v. *Banton*, 273 U. S. 418 [47 Sup. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236]; *Fairmont Creamery Co.* v. *Minnesota*, 274 U. S. 1 [47 Sup. Ct. 506, 71 L. Ed. 893, 52 A. L. R. 163]; *Ribnik* v. *McBride*, 277 U. S. 350 [48 Sup. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327]; *Williams* v. *Standard Oil Co.*, 278 U. S. 235 [49 Sup. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596]; *New State Ice Co.* v. *Liebmann*, 285 U. S. 262 [52 Sup. Ct. 371, 76 L. Ed. 747].

We do not find it necessary to analyze the above-cited cases. There is, no doubt, some general language in these cases which tends to sustain appellant's contentions. The point is that in more recent decisions of the United States Supreme Court these cases have been discussed and have been held not to prohibit the enactment of state statutes predicated on substantially similar concepts as the one here involved. The leading case on the subject is *Nebbia* v. *New York, supra*, in-

volving the validity of the Milk Control Law of New York, which provided for a milk control board with the power to fix the minimum and maximum retail price to be charged for milk. Nebbia was prosecuted for selling milk below the price fixed by the board. Both the New York court of appeals (*People* v. *Nebbia*, 262 N. Y. 259 [186 N. E. 694]) and the United States Supreme Court, *supra*, upheld the statute as a valid and proper exercise of the police power. After commenting on the various factors leading to the enactment of the statute, including the disruption of the milk business caused by demoralizing competition resulting in destructive price cutting practices by retailers, the court held the business was subject to control and regulation and sustained the statute. After discussing at length the police power and its proper use in promoting the general welfare, the court pointed out (p. 524) that "these correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge. his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need." The court then commented upon many cases upholding statutes limiting the individual in the use of his property, including statutes forbidding the giving of trade inducements "and other forms of price discrimination" and statutes prohibiting monopolies and fostering free and open competition. The court then stated that Nebbia's contentions, which are exactly the same contentions made by appellant here, were unsound, using the following language (p. 531) :

"But we are told that because the law essays to control prices it denies due process. Notwithstanding the admitted power to correct existing economic ills by appropriate regulation of business, even though an indirect result may be a restriction of the freedom of contract or a modification of charges for services or the price of commodities, the appellant urges that direct fixation of price is a type of regulation absolutely forbidden. His position is that the fourteenth

amendment requires us to hold the challenged statute void for this reason alone. The argument runs that the public control of rates or prices is *per se* unreasonable and unconstitutional, save as applied to businesses affected with a public interest; that a business so affected is one in which property is devoted to an enterprise of a sort which the public itself might appropriately undertake, or one whose owner relies on a public grant or franchise for the right to conduct the business, or in which he is bound to serve all who apply; in short, such as is commonly called a public utility; or a business in its nature a monopoly. The milk industry, it is said, possesses none of these characteristics, and, therefore, not being affected with a public interest, its charges may not be controlled by the state. Upon the soundness of this contention the appellant's case against the statute depends.'' The court then held that the dairy industry was not a public utility, and that there was not present any suggestion of monopoly, and then continued (p. 532): ''The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago. (*Munn* v. *Illinois*, 94 U. S. 113 [24 L. Ed. 77].) The appellant's claim is, however, that this court, in there sustaining a statutory prescription of charges for storage by the proprietors of a grain elevator, limited permissible legislation of that type to businesses affected with a public interest, and he says no business is so affected except it have one or more of the characteristics he enumerates. But this is a misconception. Munn and Scott held no franchise from the state. They owned the property upon which their elevator was situated and conducted their business as private citizens. No doubt they felt at liberty to deal with whom they pleased and on such terms as they might deem just to themselves. Their enterprise could not fairly be called a monopoly, although it was referred to in the decision as a 'virtual monopoly'. This meant only that their elevator was strategically situated and that a large por-

tion of the public found it highly inconvenient to deal with others. This court concluded the circumstances justified the legislation as an exercise of the governmental right to control the business in the public interest; that is, as an exercise of the police power. It is true that the court cited a statement from Lord Hale's De Portibus Maris, to the effect that when private property is 'affected with a public interest, it ceases to be *juris privati* only'; but the court proceeded at once to define what it understood by the expression, saying: 'Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large' (p. 126). Thus understood, 'affected with a public interest' is the equivalent of 'subject to the exercise of the police power'; and it is plain that nothing more was intended by the expression.'' After referring to many illustrations of the valid regulation of private business the court stated (p. 536) : ██ ''The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions 'affected with a public interest', and 'clothed with a public use', have been brought forward as the criteria of the validity of price control, it has been admitted that they are not susceptible of definition and form an unsatisfactory test of the constitutionality of legislation directed at business practices or prices. These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. ██ But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells.''

It is quite significant that the various cases relied upon by appellant in the instant case were cited in the dissenting opinion in the Nebbia case. The rule of the Nebbia case has been since followed. (*Bordens Farm Products Co.* v. *Ten Eyck*, 297 U. S. 251 [56 Sup. Ct. 453, 80 L. Ed. 669].) It is true that in these cases the United States Supreme Court emphasized the emergency nature of the legislation. The emergency referred to was in fact part of the background of the statutes. In determining judicial action, however, the char-

acter of the situation sought to be remedied rather than its abruptness is the governing factor. ▮▮ As we interpret the Nebbia case and the cases from this court hereafter referred to, in passing upon the validity of such statutes the sole constitutional yardstick by which they should be measured is the necessity for and the reasonableness of the regulation. The question as to whether the statute involves direct or indirect price fixing is a false quantity.

In *Old Dearborn D. Co.* v. *Seagram Distiller's Corp.,* 299 U. S. 183 [57 Sup. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476], the court upheld the validity of the Illinois Fair Trade Act, a statute substantially identical with the California Fair Trade Act, upheld in *Max Factor & Co.* v. *Kunsman, supra.* Such statutes permit the owner of trade-marked articles to fix the resale price of such articles. The basic purpose of such a statute and the one here involved is the same. Both are aimed primarily at cut price retailing and the ruinous use of loss leaders. The Fair Trade Act aims to correct the evil from above by legalizing resale price maintenance, by penalizing all who sell trademarked articles in disregard of the owner's contract even though not parties to it. The present statute operates from below and is broader in scope. In its true sense it is not a price fixing statute at all. It merely fixes a level below which the producer or distributor may not sell with intent to injure a competitor. In all other respects price is the result of untrammelled discretion. This was the exact holding of the Supreme Court of Tennessee, in *Rust* v. *Griggs,* (Tenn.) 113 S. W. (2d) 733, in upholding the Tennessee act comparable to the statute here involved.

This court in the Max Factor & Co. case, *supra,* in answering the contention that the Fair Trade Act unlawfully restricted the owner of property in selling the same at prices fixed by himself stated: (p. 458) "When the statute is viewed from the standpoint of police power, it is at once apparent that it is not a complete answer to the question of constitutionality to merely point out that the statute restricts a retailer from selling property of a certain class owned by him at prices fixed by himself, and so, of course, restricts his freedom of contract. ▮▮ There is no constitutional right to own property, as such, free from regulation. That a state statute deprives a person of a right which he formerly possessed, whether it be a right to go where he pleases, conduct himself

as he pleases, or buy what he pleases, or sell what he pleases at prices fixed by himself, does not *per se* brand the statute as unconstitutional. The process of civilization has consisted largely of the gradual regulation of the individual in his liberty of action and ownership of property for the public good. As society has become more complex, the necessity for such regulation has become more acute. Neither the state nor the federal Constitution guarantees any person absolute liberty of action. The liberty guaranteed by our law is a liberty subject to regulation in the public good—an equal liberty rather than an absolute liberty.'' And again at page 459 it is stated: ''Under its police power, the state, in a proper case, has the power, acting in the interests of the general welfare, to regulate property and contract rights, and this includes, of course, the power to regulate the right of free bargaining. The fact that a state can lawfully pass a statute requiring free and open competition, such as the Cartwright Act, *supra,* which regulates the rights of a manufacturer or producer, and limits his freedom of contract, indicates this power exists.

''The fact that a statute limits the rights of the owner of property, lowers its value, or limits its use, or limits the right of free bargaining in other ways, does not, of itself, determine the validity of the enactment. There are innumerable illustrations of statutes, passed under the police power, which interfere with the right of free bargaining which have been upheld on the theory the regulation is in the public interest. There are limits to this power, of course, but within those limits the legislature is supreme. These limits cannot be fixed by precedent. As the state progresses, the police power, within reason, develops to meet the changing conditions.'' After citing many illustrations of state statutes held valid although a direct limitation on the alleged right of free bargaining, this court held that in the proper case (p. 462) ''this power to regulate free bargaining includes the power to regulate the price''relying on the Nebbia case, *supra.*

It is true that the Max Factor & Co. and Old Dearborn cases involved only trademarked articles but the theory of those decisions is also applicable here.

Another case to which reference should be made is *Agricultural Prorate Com.* v. *Superior Court,* 5 Cal. (2d) 550 [55 Pac. (2d) 495], upholding the constitutionality of the California Prorate Act. By that act the growers of certain

agricultural products and a state commission, in the manner therein provided, are permitted to control the quantity of the product that shall be harvested and marketed by the industry and by the individual grower, even as against dissenters. This court upheld the statute, chiefly relying upon the Nebbia case, and expressly pointed out (p. 582), after citing the exact cases relied on by appellant in the instant case, that those cases have apparently been overruled. The court concluded: (p. 582) "Under the authorities cited herein, we are of the opinion that the Prorate Act does not violate the due process clauses of the state and federal Constitutions, nor those sections which provide against the taking of private property for public use. Neither is the act in conflict with the federal Constitution which accords to all persons the equal protection of the law. If the state has the authority to fix the price at which a commodity such as milk may be sold and thus avoid the ruinous effect of unrestrained competition, as we understand the decisions of the highest court in this land so held, we can see no difference in principle in a state statute which attempts to regulate the production and marketing of a commodity, where without such regulation the industry would be practically destroyed to the great detriment not only of those engaged therein but to the state and its citizens as well."

In *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379 [57 Sup. Ct. 578, 81 L. Ed. 703, 108 A. L. R. 1330], decided in March of 1937 the United States Supreme Court expressly overruled two of the cases relied upon by appellant—*Adkins* v. *Children's Hospital,* 261 U. S. 525 [43 Sup. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238], and *Morehead* v. *New York,* 298 U. S. 587 [56 Sup. Ct. 918, 80 L. Ed. 1347, 103 A. L. R. 1445]. The statute there involved was one providing a minimum wage law for women. The court commented at length on the existing economic conditions intended to be remedied by the statute. It pointed out that the freedom of contract guaranteed by the Constitution is one subject to proper regulation. The exact statement of the court is worth quoting (p. 391) : "The principle which must control our decision is not in doubt. The constitutional provision invoked is the due process clause of the Fourteenth Amendment governing the states, as the due process clause invoked in the Adkins case governed Congress. In each case the violation alleged by those attacking minimum wage regulation for women is deprivation of freedom of

contract. What is this freedom? ▆▆▆ The Constitution does not recognize an absolute and uncontrollable liberty, and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.''

▆▆▆ Other cases could be cited. We believe that these cases clearly establish the constitutionality of the statute here under attack. The statute must be held to be a reasonable attempt upon the part of the state to accomplish a valid object. It must be borne in mind that this statute does not regulate the selling of commodities—it is the predatory trade practice of selling below cost with intent to injure competitors which the legislature on reasonable grounds has determined is vicious and unfair that is prohibited. Such determination is clearly within the legislative power. The state may not have power to regulate all trade practices affecting competition, but it clearly has power to restrict or prohibit trade practices which upon reasonable grounds it determines are predatory, vicious, unfair and anti-social.

▆▆▆ It is next urged by appellant that every sale below cost, except as provided in section 6, is made unlawful by section 3 regardless of intent, and that so construed the act is unconstitutional. It would certainly add to the weight of appellant's argument on the main issue if the statute omitted intent as an integral part of the act prohibited. It is one thing, from a legal standpoint, to prohibit sales below cost engaged in for the purpose of injuring competitors and destroying competition, and quite another to merely prohibit all such sales regardless of intent. It may well be that an absolute prohibition regardless of intent would be unreasonable. (See *Fairmont Creamery Co.* v. *Minnesota*, 274 U. S. 1 [47 Sup. Ct. 506, 71 L. Ed. 893, 52 A. L. R. 163].) However, it is our opinion that section 3, properly interpreted, requires the designated intent before selling below cost is prohibited. The language of this section, so far as pertinent

to this contention, is as follows: "It shall be unlawful for any person . . . to sell . . . any article at less than the cost thereof to such vendor, or give, offer to give . . . any article or product, or service or output of a service trade for the purpose of injuring competitors and destroying competition." Because of the absence of a comma after the word "trade", it is urged that the unlawful intent clause applies only to the giving away of articles and does not apply to the preceding clause dealing with selling below cost. This contention is without merit. We are of the view that the intent clause modifies and qualifies not only the words immediately preceding but also the selling below cost clause. We are led to this construction by several considerations.

In the first place, various sections of the act contain provisions clearly indicating that intent is a necessary element of the offense. (See secs. 1, 3, 5, 7, 13 and 15.)

In the second place the legislature amended section 3 in 1937 (Stats. of 1937, p. 2395) by inserting the comma in the proper place, and by so changing the wording of the section as to leave no doubt that selling below cost is only prohibited when the improper intent is present. This is entitled to some weight in ascertaining the legislative intent.

In the third place, there are certain rules of construction which lead to the same conclusions. These rules were clearly stated and applied in *People* v. *Kahn, supra*, in construing this identical provision. It is there stated (p. 762): "It is our opinion, however, that selling below cost is not made a public offense except where it is done for the purpose, that is, with the specific intent, of injuring competitors *and* destroying competition.

"Several rules of construction unite in leading us to this conclusion. The first is enunciated in *Porto Rico Ry. etc. Co.* v. *Mor*, (1920) 253 U. S. 345 [40 Sup. Ct. 516, 64 L. Ed. 944], where the omission of a comma between the qualifying clause and the words immediately preceding gave rise to the argument that the clause was applicable only to the nearest group of words and not to those first appearing and separated from those later used by a comma. In answer to the argument the Supreme Court stated: 'When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all.' The phrase 'for the purpose of injuring competitors

and destroying competition' is as applicable to the words dealing with selling below cost as it is to those having to do with making gifts. An even stronger case, considering the same problem of statutory construction, and arriving at the same conclusion, is *Hillsboro Coal Co.* v. *Knotts,* (1920) 273 Fed. 221.

"Our statement that the phrase quoted is applicable to both sales and gifts becomes clear when we consider the next rule of construction which is expressed in 23 California Jurisprudence, page 764, and quoted in *In re Sekuguchi,* (1932) 123 Cal. App. 537, 538 [11 Pac. (2d) 655]. 'Every statute and code section should be construed with reference to its purpose and the objects intended to be accomplished by it. The language will be so interpreted, if possible, as to aid the design and intent of the legislature and to effectuate the evident objects and purposes of the law.' As appears throughout the statute spread before us, the legislature was not solicitous lest someone in business lessen his profits by selling below cost or by giving away his substance. It is implicit throughout the act that the concern of the legislature is that which it explicitly stated in section 13: 'The Legislature declares that the purpose of this act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. This act shall be literally (*sic*) construed that its beneficial purposes may be subserved.' We reiterate, therefore, that the legislature intended to declare and has declared that selling below cost is a misdemeanor only when accomplished for the purpose of destroying competition and injuring one's competitors."

 It is also asserted that the statute fails to conform to article I, section 11, of the California Constitution, which requires that all laws of a general nature shall have uniform operation. This lack of uniformity is asserted to exist in that large chain and department stores, because of their large purchasing power, can buy for less than the smaller merchant, and may, therefore, under the act, sell for less. It is claimed that this not only constitutes unlawful discrimination, but necessarily defeats the claimed purpose of the act, in that such a situation fosters rather than prevents monopolies. This last contention, as has already been pointed out, deals with a reasonably debatable economic problem, and is therefore

within the legislative field. The first contention has two complete answers.

■ In the first place, the uniformity required by such a provision as article I, section 11, is uniformity in operation, not uniformity of result. (*State* v. *Darling*, 216 Iowa, 553 [246 N. W. 390, 88 A. L. R. 218] ; *Bowers* v. *Glos*, 346 Ill. 623 [179 N. E. 80].) If there is any theoretical ''discrimination'' resulting from the statute it is due to the very fact that the law is uniform in its operation, and does not classify.

In the second place, although it is true that by fixing the minimum permissible price at cost section 3 may permit one merchant to sell for less than another, as expressed by one commentator ''the poison, if such it be, contains its own antidote by exempting from operation of the statute, any endeavor made in good faith to meet the legal prices of competitors'' (47 Yale Law Journal, 1201) as provided in section 6 (d).

■ Appellant and *amici curiae* present various hypothetical situations, and contend that as applied to these situations the statute is unconstitutional. We are not permitted to consider these hypothetical situations. In answering the identical problem in the Max Factor & Co. case, *supra* (p. 468), this court stated: ''Respondent presents several hypothetical situations under which enforcement of the act would be inequitable or difficult, or, perhaps, even unconstitutional. It is elementary, of course, that a statute may be invalid as applied to one set of facts, yet valid as applied to another. (*Dahnke-Walker Milling Co.* v. *Bondurant*, 257 U. S. 282 [42 Sup. Ct. 106, 66 L. Ed. 239].) The situations conjured up by respondent are not here involved, and respondent is limited in his attack to the application of the statute to the factual situation now before the court. Moreover, the principal remedy granted by the statute is injunctive relief. The equity court has broad and flexible discretionary powers, and can, and undoubtedly would, deny injunctive relief where such relief would be inequitable.''

■ The contention that because section 1 excludes the lease of motion pictures from the operation of the act, the act is discriminatory, cannot be properly raised by this appellant. (*Smiley* v. *Kansas*, 196 U. S. 447, 457 [25 Sup. Ct. 289, 49 L. Ed. 546].)

662

■ The last contention of appellant necessary to be discussed is that the definition of "cost of doing business" found in section 3 is indefinite and uncertain. Appellant is in no position to urge this point. The parties stipulated and the ,trial court found that appellant sold the goods here involved at less than invoice or replacement cost, plus the appellant's cost of doing business. The parties likewise stipulated that the cost of doing business in appellant's line of activity was an established fact, well known to all in the trade, including appellant. Obviously, the provisions defining cost of doing business must have been sufficiently certain and. definite to appellant at the time it stipulated to the fact. We have no way of ascertaining in this case whether the provisions relating to the cost of doing business contained in the act are too uncertain and indefinite to reasonably be applied by any merchant. Appellant and its supporting *amici curiae* urge with great vehemence that it is practically impossible for any merchant to have available the necessary facts for an accurate calculation of cost of doing business as applied to each article during the course of any current year. Respondent and its supporters urge that simple and proper accounting practices will disclose the necessary information. Under such circumstances the issue cannot and should not be determined in this proceeding. When and if the issue is properly presented against a proper factual background with appropriate evidentiary material, this court can then and only then determine the reasonableness of this provision. It may well be that such evidence will disclose that the apprehensions of appellant are groundless. Moreover, the present case involves an application for an injunction. We are not now considering the criminal provisions of the act. In an equity case the trial court "has broad and flexible discretionary powers, and can, and undoubtedly would, deny injunctive relief where such relief would be .inequitable". (*Max Factor & Co.* v. *Kunsman, supra.*) It should also be mentioned that in *Rust* v. *Griggs, supra,* the Tennessee Supreme Court upheld a provision in relation to cost of doing business that on its face appears to be more vague and uncertain than the one here involved.

■ For the foregoing reasons it must be held that, as applied to the facts of this case, the Unfair Practices Act is constitutional, in so far as it grants to those in the position

of respondent the right to injunctive relief. The statute embodies the concept that sales made at a loss to the seller, when made for the purpose of injuring or destroying competition, are predatory and anti-social in character. The economic wisdom of such a concept may be debatable, but being debatable, the legislature is empowered to choose between its acceptance or rejection. The statute, so far as the facts here involved are concerned, goes no further than reasonably necessary to effectuate that choice.

It is our opinion that neither the due process clause, nor any other constitutional restraint, state or federal, prohibits the legislature from acting to curb predatory merchandizing practices which tend to injure or destroy fair and open competition.

The judgment appealed from is affirmed.

Curtis, J., Langdon, J., Seawell, J., Houser, J., and Shenk, J., concurred.