[Civ. No. 42549. Second Dist., Div. Five. Oct. 15, 1974.]

PARAMOUNT GENERAL HOSPITAL COMPANY et al.,
Plaintiffs and Appellants, v.
NATIONAL MEDICAL ENTERPRISES, INC., et al.,
Defendants and Respondents.

## COUNSEL

Zerner, Sims & Cibener and Edward S. Sims for Plaintiffs and Appellants.

Ervin, Cohen & Jessup, Arthur Fields and Richard A. Blacker for Defendants and Respondents.

## Opinion

**KAUS, P. J.**—Action for damages and injunctive relief under the Unfair Practices Act ("the Act"). Plaintiffs Paramount General Hospital Company, a limited partnership, and Paramount General Hospital, Inc., appeal from a judgment in favor of defendant National Medical Enterprises, Inc., and various individual defendants, after the trial court sustained defendants' general demurrers to plaintiffs' second amended complaint without leave to amend.

### Allegations of Complaint

Plaintiffs[1] own and operate as a business, a hospital and adjoining medical office building in Paramount. For the "purpose of earning a profit" the partnership "supplies"[2] office space in the medical building to doctors. Plaintiffs also supply the following services: answering service, direct communication facilities to the hospital, receptionist service, "specialized suite improvements," radiological, pharmaceutical and other such services in the medical building; utilities; janitorial and security services, parking; and, in the adjoining hospital, laboratory, clinical testing, diagnostic, therapeutic and related facilities.

Defendants are plaintiffs' competitors. When this action was filed, defendants were about to open a hospital and were constructing a medical building in Lakewood, a few miles from plaintiffs' hospital and medical building in Paramount. Defendants offered about a dozen named and five unknown doctors, medical office space and all the services enumerated above that plaintiffs now furnish to doctors.

Plaintiffs allege that by the means described below, defendants are either giving away or selling below cost the use of office space in the medical building and the various services described above.[3] Defendants are making these offers for the purpose of destroying competition from plaintiffs.

---

[1]Paramount General Hospital Company, a limited partnership, whose general partner is Irving Moskowitz, M.D., owns a hospital and medical building, which it leases to plaintiff, Paramount General Hospital, Inc., in which the majority shareholder is Dr. Moskowitz. The limited partners and minority shareholders are also the same, and include some of the doctors referred to in the complaint.

[2]The reason that plaintiffs avoid the word "lease" or "rent" will become clear in the discussion.

[3]Defendants have offered to furnish the doctors the following package: They will sell their medical building to the doctors, subject to a deed of trust to secure a loan in the amount of the cost of the medical building. The loan is repayable over 20 to 25 years in equal installments of principal and interest. The doctors will not assume the loan, will not be liable on the note and will invest nothing in the medical building. De-

Plaintiffs have been injured, because various specified doctors, who would have used plaintiffs' "space and services" have accepted or intend to accept defendants' below-cost or giveaway offers. Plaintiffs have "lost the patronage of the patients" who would have been "supplied" by those doctors who will be accepting defendants' offer. Plaintiff partnership, which owns the office building, has been damaged over a four-month period in the amount of about $11,000 in lost rentals; plaintiff corporation, which owns the hospital, has been "actually damaged in the amount of $796,000 or more, which is the net income that plaintiff corporation would have earned from said patients which it lost." (See fn. 14, *infra.*)

Plaintiffs, in a second cause of action, recharacterize the appropriate facts alleged above as a "secret rebate" of which future tenants, who will be charged more, will not be advised.

### DISCUSSION

The Unfair Practices Act (Bus. & Prof. Code, § 17000 et seq.)[4] prohibits: (1) Selling below cost or giving away any "article or product" for

fendants will also lease the land on which the medical building stands to the doctors for 30 to 50 years at $30,000 a year, which plaintiffs allege is less than the "fair rental value" of the land.

Second, the doctors will lease the building back to defendants for a term about equal to the term of the loan on the purchase of the building. Defendants will maintain the building, pay taxes, and pay the doctors rental in an amount that will exceed the loan payments by $6,700 annually.

Third, the doctors will lease office space from defendants for a period of ten years. The rental will amount to $6 per square foot; however, defendants' cost in maintaining the office space will be $6.25 a square foot.

In brief, according to plaintiffs, the plan envisions the doctors leasing the building back to defendants at a profit, and defendants leasing—or subleasing—space back to the doctors at a loss. At the end of about 25 years, the doctors will own the building outright, which will then have a remaining useful life of about 5 years, and the fair market value of the remaining term of the land lease will be at least $600,000.

The doctors will not be expected to wait 25 years, however. Plaintiffs allege that defendants and the doctors will agree that after five years, the doctors may exercise an option to require defendants to repurchase the building and land lease under an agreement, detailed by plaintiffs, which will result in the doctors receiving a sum ranging from $331,000 to $911,000 plus interest over a four-year period. Meantime, the doctors will be paying rent on their allegedly below-cost leases.

Plaintiffs allege that in addition to the sale and lease package described above, defendants have purchased from some of the doctors certain real property at a price that defendants knew was substantially higher than fair market value and have offered to purchase from other doctors real property, also knowingly at a price substantially higher than fair market value. Defendants have offered to assume the present medical building lease obligations of the doctors and have offered to pay the legal fees involved in setting up the organization to buy and lease back defendants' medical building. Defendants have also offered to buy out at allegedly inflated prices partnership and stockholder interests of some of the doctors in plaintiffs' operations. (*Ante,* fn. 1.)

[4]Unless otherwise indicated, all references are to the Business and Professions Code.

the purpose of injuring competitors or destroying competition (§ 17043); (2) selling or using any "article or product" as a "loss leader" (§ 17044); (3) secret rebates, or the extension of special services or privileges to certain purchasers (§ 17045); and—not involved in this case—(4) locality discrimination with respect to any "article or product" (§ 17040).

The Unfair Practices Act was enacted in 1941. (Stats. 1941, ch. 526, § 1.) (See, generally, Barron, *California Antitrust—Legislative Schizophrenia* (1962) 35 So.Cal.L.Rev. 393, 400.) However, "locality discrimination" has been prohibited since 1913. (Stats. 1913, ch. 276, § 1.) Since 1933, secret rebates (Stats. 1933, ch. 261, § 1) and below-cost sales or giveaways (Stats. 1933, ch. 504, § 1) have been prohibited. (See generally *Wholesale T. Dealers* v. *National etc. Co.*, 11 Cal.2d 634, 640, seq. [82 P.2d 3, 118 A.L.R. 486].) The provisions of the Act have remained substantially unchanged since 1941. (See *Dooley's Hardware Mart* v. *Food Giant Markets, Inc.*, 21 Cal.App.3d 513, 516-517 [98 Cal.Rptr. 543].)

In enacting the Act, the Legislature set itself no small goal. In section 17001 it declared that the purpose of the Act was "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented."

It will be noted that what the Legislature sets out to "foster and encourage" is competition generally, not just competition in the sale or furnishing of certain goods or services.[5] The issue posed by this litigation must be viewed in the light of this broad legislative target.

To achieve its aim, the Legislature specifically provided that the Act "shall be liberally construed that its beneficial purposes may be subserved." (§ 17002.)

Further—and this is vital in view of defendants' contention that this litigation involves nothing but leases to real property to which transactions covered by the Act are as incidental as "tires on a newly purchased automobile"—section 17049 provides in relevant part as follows: "The prohibitions of this chapter against . . . sales below cost embrace any scheme

---

[5]Respondents make much of the definition of "ordinary channels of trade" in section 17028 which refers to "ordinary, regular and daily transactions in the mercantile trade . . . ." Nothing in the Act, however, confines its impact to such trade. The term "ordinary channels of trade" becomes relevant only in two situations: (1) To establish costs (§§ 17027, 17077); and, (2) To define certain irrelevant exclusions from the Act. (§ 17050, subds. (d), (e).)

of special rebates, collateral contracts or *any device of any nature whereby such . . . sale below cost is in substance or fact effected in violation of the spirit and intent of this chapter."* (Italics added.)

■ The specific prohibition contained in the Act on which plaintiffs chiefly rely is found in section 17043: "It is unlawful for any person[6] engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."

Defendants in their brief pose the issue on this appeal as follows: "Where the subject matter of the complaint is a proposed *ten-year lease of real property,* namely medical building office space, is a cause of action stated under those sections of the California Unfair Practices Act which proscribe the 'sale below cost' or 'giving away' of *'articles or products'* by vendors'?" (Italics in original.)

In thus posing the issue defendants lose sight of the pleaded facts as well as the law.

Factually, we are not concerned with a simple lease of real property. Plaintiffs and defendants compete in offering to the medical profession specially designed working quarters, as well as a variety of sophisticated, specialized services. Legally it is misleading to suggest that such terms as "sell," "give," "article or product" or "vendor," when used in the Act, have only the simple meanings which they suggest to laymen.

We first turn to the Act's remarkably open-ended definitions of the relevant terms. Emulating equity which does not "put a fence around fraud," the Legislature obviously sought to avoid the pitfall of circumscribing the transactions covered by the Act with such precision that its substantive purpose could be evaded by methods of marketing contrary to the spirit but without the literal reach of the Act. (See § 17049, quoted *supra*.) To this end, every definition relevant to section 17043 is framed in terms of what the concept defined "includes." ■ The term "includes" is "ordinarily a word of enlargement and not of limitation. [Citation.] The statutory definition of thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions." (*People* v. *Western Air Lines, Inc.,* 42 Cal.2d 621, 639 [268 P.2d 723]; see also, e.g., *Television Transmission* v. *Public Util. Com.,* 47 Cal.2d 82, 85 [301 P.2d 862].)

■ Thus, the Act defines "sell," to *include* "selling, offering for sale

---

[6]Defined to include "any person, firm, association, organization, partnership, business trust, company, corporation or municipal or other public corporation." (§ 17021.)

or advertising for sale" (§ 17022) and "give," to *include* "giving, offering to give or advertising the intent to give" (§ 17023). Further, the Act defines "article or product," to *include* "any article, product, commodity, *thing of value, service* or *output of a service trade.*" (§ 17024; italics added.)[7] The statutory definitions are "illustrative rather than restrictive." (*In re Cox,* 3 Cal.3d 202, 216 [90 Cal.Rptr. 24, 474 P.2d 992].)

Defendants first assert that they are not "selling" or "giving away" because these transactions involve transfers of title which defendants' lease-service packages do not. The point is illusory: services or the outputs "of a service trade" are covered by the Act because they are "articles or products" as defined in section 17024. Services, however, do not involve the passage of title: the words "selling" and "giving away" therefore cannot possibly carry the technical meaning defendants would give them.[8] No title to anything passes in connection with such services as diaper washing (*Sandler* v. *Gordon,* 94 Cal.App.2d 254 [210 P.2d 314]), hair cutting (*Garner* v. *Journeyman Barbers' etc. Union,* 223 Cal.App.2d 101 [35 Cal.Rptr. 693]) or the cleaning and rental of uniforms (*Page* v. *Bakersfield Uniform etc. Co.,* 239 Cal.App.2d 762 [49 Cal.Rptr. 46])—all of which have been held to be covered by the Act.[9]

---

[7]The Act also defines "vendor," to *include* "any person who performs work upon, renovates, alters or improves any personal property belonging to another person." (§ 17025.) If defendant's restrictive reading of the Act's definitions is correct, the only "vendors" to which it applies are artisans; to violate it, one would have to be an artisan who works on other people's personal property and who sells "at less than the cost" to himself.

Further proof that the statutory definitions were not meant to be exclusive lies in the statutory exception for "Motion picture films when licensed for exhibition to motion picture houses . . . ." (§ 17024.) If the Act is limited to outright sales or gifts of chattels, or services, there would be no need to except the licensing of the right to show a motion picture.

[8]Compare our Supreme Court's nontechnical use of the words "sell" and "purchase" when applied to the rental of housing in *Green* v. *Superior Court,* 10 Cal.3d 616, 625 [111 Cal.Rptr. 704, 517 P.2d 1168].

[9]Defendants ignore the inclusion in section 17024 of "any . . . thing of value." If it mattered, settled rules of statutory interpretation would compel us to determine what special significance the Legislature ascribed to that phrase. We find it unnecessary to do so, but will point out that historically "thing" is an all-encompassing definition, comprising every kind of property, real and personal. Thus, Blackstone writes: "The objects of dominion or property are *things,* as contradistinguished from *persons*: and things are by the law of England distributed into two kinds: things *real,* and things *personal.* Things real are such as are permanent, fixed, and immovable, which cannot be carried out of their place; as lands and tenements: things personal are goods, money and all other moveables; which may attend the owner's person wherever he thinks proper to go." (Book 2, ch. 2, § 15. Italics in original.)

More to the point, the term "thing of value" has been even more broadly interpreted. In California it has been applied to deeds of trust (*Coulter* v. *Collins,* 71 Cal.App.

The trial court recognized quite correctly that nothing in the Act immunizes businessmen who market lease-service arrangements. Nevertheless, it found the Act inapplicable because, in its words, "[t]he 'services' to be provided as a part of the package are wholly ancillary to the [real estate] . . . transaction."

The trial court thus properly rejected the notion that the Act does not apply merely because a transaction covered by it is contractually combined with one that it assumed to be immune from its impact.[10] Unfortunately, it then carved out an exception, not justified by anything in the Act, under which it immunized the entire package because the services, clearly covered by the Act, were merely "ancillary" to the lease which it thought to be unaffected by it.

From the point of view of the Act's purpose—the fostering and encouragement of competition—it cannot matter which element of a package is functionally "ancillary" to the other: what is vital is whether the part of the package clearly covered by the Act is so substantial that cost-cutting with respect to it can be used as a means to injure or destroy competition.[11] Thus—to borrow defendants' simile—if competition in the automobile business can be injured or destroyed by giving away the tires, they are a substantial part of the package—yet tires without a car are as useless to a driver as are services without an office to a doctor.

Thus, defendants' lease-service package fits comfortably into the non-inclusive definition of "article or product" of section 17024. That "sell"

---

381, 385 [235 P. 465]), the cancellation of county taxes (*City of Ojai* v. *Chaffee,* 60 Cal.App.2d 54, 59 [140 P.2d 116]) and classified advertisements (*Independent Journal Newspapers* v. *United Western Newspapers, Inc.,* 15 Cal.App.3d 583, 586, fn. 3 [93 Cal.Rptr. 299]). In other jurisdictions, such diverse matters as worthless checks (*McCormick* v. *State* (Fla.App. 1964) 161 So.2d 696, 698), waivers of mechanics liens (*Beasley* v. *People* (1969) 168 Colo. 286, 287 [450 P.2d 658]), mortgage participating certificates (*Stauss* v. *Title Guarantee & Trust Co.* (1940) 284 N.Y. 41, 46 [29 N.E.2d 462]), a woman's chastity (*Phillips* v. *State* (Okla. Crim. 1954) 267 P.2d 167, 169-170), and information concerning employees (*Zentner* v. *American Federation of Musicians of U. S. & Can.* (S.D.N.Y. 1965) 237 F.Supp. 457, 463) have been found to be "things of value." There appears to be no historical reason why the bundles of rights, privileges, powers and immunities (Rest., Property, §§ 1-5) which characterize interests in real property of one kind or another, are not "things of value."

[10]We need not and therefore do not decide the correctness of the trial court's unarticulated premise that "pure" lease agreements—those which do not involve the furnishing of any service by the lessor—are not covered by the Act.

[11]Even if the value of the services offered by respondents is only 5 percent of the value of the total package, it seems clear that in a competitive market a "vendor" who has financial resources that enable him to absorb a temporary loss by offering the services below their cost may effectively destroy competition by doing so.

and "give" (§§ 17022, 17023) cannot be read in their technical sense has already been demonstrated. Collectively, they obviously refer to any method—sale, lease, consignment, and so forth—of marketing articles or products.[12]

Defendants also refer us to various partial statutory definitions of "cost,"[13] arguing that plaintiffs would be unable to prove below-cost selling under the Act's standards because the definitions do not fit defendants' package.

These arguments anticipate plaintiffs' problems at the trial stage and as such are premature. Having in mind the incredibly complex nature of the package being offered by defendants—see footnote 3, *supra*—proof of their costs will undoubtedly become a lawyer's nightmare, though it may turn out to be a C.P.A.'s dream. (McCarthy, *Whatever Happened to the Small Businessman? The California Unfair Practices Act* (1968) 2 U.S.F. L.Rev. 165, 177-178.) All the same we find nothing in the Act's definition of "costs" which compels a holding that plaintiffs can never prove what they allege.

In summary, we hold that plaintiffs have stated a cause of action for damages and injunctive relief based on a violation of section 17043. They have also stated a cause of action for injunctive relief based on an alleged threat to violate the prohibitions against the secret rebates of section 17045.

The judgment is reversed with directions to overrule defendants' general demurrer.[14]

Stephens, J., and Ashby, J., concurred.

A petition for a rehearing was denied November 4, 1974, and respondents' petition for a hearing by the Supreme Court was denied December 11, 1974.

---

[12]Cf. *Price* v. *Shell Oil Co.,* 2 Cal.3d 245, 252, footnote 7 [85 Cal.Rptr. 178, 466 P.2d 722].

[13]These definitions are contained generally in sections 17026, 17027, and 17029 of the Act. See, generally, Barron, *supra,* 35 So.Cal.L.Rev. 393, 402-404.

[14]Their special demurrers and motions to strike went "off calendar" and remain to be ruled on by the trial court. At least two of these special demurrers address an issue on which we have not commented, because the parties have not argued it: the standing of the plaintiff corporation—as distinguished from the plaintiff partnership—as a plaintiff seeking damages. (See § 17070.)