Filed 8/28/20  Bassler v. Stephens Institute CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| MARGARET BASSLER et al.,<br>      Plaintiffs and Appellants,<br>BENNETT GOLDBERG et al.,<br>      Plaintiffs and Respondents,<br>v.<br>STEPHENS INSTITUTE,<br>      Defendant and Respondent | A156949<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-17-557866) |

Plaintiffs Bennett Goldberg and Linda Kuckuk (Goldberg plaintiffs), Margaret Bassler, and Chloe Stanfield (jointly, plaintiffs) filed a complaint against defendant Stephens Institute, doing business as The Academy of Art Institute (Academy), for penal fines and injunctive relief based on an alleged violation of the San Francisco Residential Rent Stabilization and Arbitration Ordinance, San Francisco Administrative Code section 37.1 et seq. (Rent Ordinance).  The Goldberg plaintiffs alleged the claim for penal fines on behalf of their deceased daughter, Aaryn Goldberg (Aaryn), who was a student at the Academy.  The Academy filed a demurrer to the complaint, asserting the Goldberg plaintiffs lacked standing to assert the claim for penal fines, and moved to strike certain class allegations relating to delayed

discovery.  The Academy also moved to compel arbitration as to plaintiffs Bassler and Stanfield.

The trial court sustained the Academy's demurrer, concluding the Goldberg plaintiffs lacked standing to assert the claim for penal fines.  It also granted in part the Academy's motion to strike on the basis that the delayed discovery allegations could not be proven on a class-wide basis.  Finally, the trial court denied the Academy's motion to compel arbitration, concluding the claims were not within the scope of the arbitration provision.  Judgment was entered against the Goldberg plaintiffs.

The Goldberg plaintiffs appealed from both the demurrer and the motion to strike orders.  The Goldberg plaintiffs assert the trial court erred because (1) the claim for penal fines survived Aaryn's death and they thus have standing to bring such a claim, and (2) delayed discovery can be proven on a class-wide basis through the common course of conduct doctrine.  The Academy also appealed, asserting the trial court erred in denying its motion to compel arbitration because the claims are covered by the parties' valid arbitration provision.  We disagree with both the Goldberg plaintiffs and the Academy, and we affirm the trial court's orders.[1]

## I.  BACKGROUND

### A.  Statement of Facts

The Academy is a California corporation that operates a for-profit art school.  All students admitted into one of the Academy's programs of study

---

[1] On December 16, 2019, plaintiffs Bassler and Stanfield filed a request for judicial notice of 47 documents filed in the United States District Court for the Northern District of California, *Goldberg v. Stephens Institute*, case No. 3:16-cv-02613.  On March 16, 2020, the Academy filed a request for judicial notice of eight press articles.  We deny both requests for judicial notice because these documents are "not relevant to disposition of this appeal."  (*Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 221, fn. 13.)

must sign an enrollment agreement. The enrollment agreement states it "covers the entire enrollment at the [Academy]." The agreement sets forth the program in which the student is enrolled, the fees, charges and tuition associated with the program, and the term for which the student is enrolling, as well as addressing issues such as cancellation, withdrawal, and refunds. The agreement also contains an arbitration provision. That provision states in relevant part: "Any controversy or claim arising out of or relating to this agreement, breach of this agreement, or termination, whether such dispute gives rise to or may give rise to a cause of action in contract, tort, discrimination . . . or based on any other theory of statute, shall be submitted exclusively to final and binding arbitration in accordance with the laws of the State of California . . . ."

The Academy also offers residential housing to students "enrolled full-time and onsite as determined by the Office of the Registrar." Eligible students may access the housing by entering into a separate agreement with the Academy for each academic year (housing license agreement). The housing license agreements expressly state: "This Agreement grants Student permission to use a bed space within [an Academy] residence hall . . . . It is understood and agreed by Student and the [Academy] that this Agreement is a license and not a lease, and that no lease nor any other interest or estate in real property is created by this Agreement . . . . Student is further informed and acknowledges that his or her room . . . does not constitute a Rental Unit as defined by the [Rent Ordinance] or the regulations promulgated pursuant to the Rent Ordinance . . . ." The housing license agreements further state the Academy "may terminate the Student's license to use the room upon 24-hours written notice to Student . . . without alleging just cause under the Rent Ordinance." The housing license agreements do not contain an

3

arbitration provision.  Aaryn and plaintiffs Bassler and Stanfield signed both enrollment agreements and housing license agreements with the Academy.

## B.  Procedural Background

The Goldberg plaintiffs originally filed their complaint in the United States District Court for the Northern District of California, *Goldberg v. Stephens Institute*, case No. 3:16-cv-02613 (*Academy I*).  The complaint was dismissed without prejudice due to lack of federal jurisdiction.  The Goldberg plaintiffs then refiled their complaint in California state court.  Following multiple years of litigation, a second amended complaint (SAC) was filed, which added plaintiffs Bassler and Stanfield.  The SAC alleges all plaintiffs were registered students with the Academy and occupied "bed spaces" pursuant to housing license agreements with the Academy.  The SAC asserts two causes of action against the Academy: (1) penal fines arising from the Academy's violation of the Rent Ordinance, and (2) a public injunction.  Specifically, the SAC contends the Academy knew its housing was subject to the Rent Ordinance despite statements to the contrary.  The SAC further alleges the Academy "never once itself had any good faith belief" that the Academy's housing was subject to any exemption from the Rent Ordinance.  Rather, the SAC claims, the Academy "knowingly, intentionally and deliberately concealed the bad faith nature of its assertion" that Academy housing was exempt from the Rent Ordinance.  The SAC asserts the Academy's concealments were aggravated by the Academy's false affirmative claims that it had certain rights under the housing license agreements.

The plaintiffs filed the SAC on their own behalf as well as on behalf of a class comprised of "all Resident Academy Students who were ever made

4

subject to [housing license agreements] during the Relevant Time Period."[2] The SAC further designates two subclasses: the "Statutory Sub-Class" is comprised of those students who had housing license agreements within one year prior to the initial date of the filing of *Academy I*; the second, "Discovery Sub-Class," is comprised of those students who executed housing license agreements more than one year prior to the initial date of the filing of *Academy I* but after December 19, 2008. As to the discovery subclass, the SAC asserts discovery of the Academy's misrepresentations would not have occurred prior to May 2016, because no lay person would have been able to understand the Academy's position, and the media coverage and public statements regarding the Academy's housing were insufficient to place the class on notice.

The Academy filed a demurrer to the SAC. The Academy alleged the Goldberg plaintiffs, as successors in interest, lacked standing to seek statutory penalties and failed to seek such penalties within the applicable statute of limitations. The Academy further argued the Goldberg plaintiffs failed to allege sufficient facts to support tolling the limitations period.

In connection with the demurrer, the Academy also filed a motion to strike various portions of the SAC. Specifically, the motion sought to strike allegations related to the discovery subclass as improper because the plaintiffs "have not met and cannot meet their burden to plead sufficient facts to support delayed accrual of their claims under the discovery rule." The motion also sought to strike various provisions in the prayer for relief.

Finally, the Academy sought to compel arbitration as to plaintiffs Bassler and Stanfield. The Academy asserted the first cause of action for

---

[2] The SAC defines the relevant time period as December 19, 2008 to the date on which a class is first certified in this matter.

penal fines relates to the plaintiffs' enrollment agreements, which contain a binding arbitration provision.

Plaintiffs opposed all three motions. The Goldberg plaintiffs argued in relevant part that Aaryn's claim for statutory penalties survived her death under present California law. Plaintiffs also argued they adequately alleged the existence of the discovery subclass. In opposition to the motion to compel, plaintiffs asserted the Academy waived the arbitration provision as a result of its decision to litigate the matter for the prior three years, the Academy's preservation of its litigation rights precludes enforcement of the arbitration provision, the arbitration provision is not sufficiently related to the claims to justify its application, and the arbitration clauses are void.

The trial court sustained the Academy's demurrer as to the Goldberg plaintiffs' first cause of action without leave to amend. The trial court explained section 37.10B, subdivision (c)(5) of the Rent Ordinance imposes statutory penalties that are "clearly penal in nature as it is not based upon actual loss sustained."[3] The court thus concluded such penalties are not assignable and did not survive Aaryn's death because a successor in interest may only recover penalties to the extent they are based upon actual loss or damage.

The trial court also granted in part the Academy's motion to strike as to the SAC's allegations that pertained to the discovery subclass. The court explained "the question of whether the delayed discovery rule applies to

---

[3] Rent Ordinance section 37.10B, subdivision (c)(5) states in relevant part: "Any person who violates or aids or incites another person to violate the provisions of this Section is liable for each and every such offense for money damages of not less than three times actual damages suffered by an aggrieved party (including damages for mental or emotional distress), or for statutory damages in the sum of one thousand dollars, whichever is greater . . . ."

6

members of the 'Discovery Sub-Class' is not amenable to class treatment." However, the court denied the motion as to allegations pertaining to the application of the delayed discovery rule with respect to the named plaintiffs. The Goldberg plaintiffs dismissed their second cause of action, and judgment was entered against the Goldberg plaintiffs.

However, the trial court denied the motion to compel arbitration. The court noted the enrollment agreement exclusively addressed the terms and conditions of the students' matriculation, contained no provisions related to bed spaces or housing, and was a separate agreement from the housing license agreements. The court further noted the housing license agreements did not contain an arbitration provision. Consequently, the trial court concluded the plaintiffs' claims based on alleged violations of the Rent Ordinance did not fall within the scope of the arbitration provision contained in the enrollment agreements.

The Goldberg plaintiffs subsequently appealed from the orders sustaining the demurrer and granting in part the motion to strike.[4] The

_____

[4] The Goldberg plaintiffs appealed from the order sustaining the demurrer without leave to amend, along with the concurrently issued order granting in part the motion to strike. They did not appeal from the formal judgment. Generally, "[a]n order sustaining a demurrer without leave to amend is not an appealable order," and "[w]e have no jurisdiction to consider the merits of an appeal from a nonappealable order." (*Sheet Metal Workers Internat. Assn., Local Union No. 104 v. Rea* (2007) 153 Cal.App.4th 1071, 1074, fn. 2.) However, a nonappealable order may be construed as a judgment for purposes of an appeal "when, like a formal judgment, it disposes of the action and precludes further proceedings." (*Thaler v. Household Finance Corp.* (2000) 80 Cal.App.4th 1093, 1098.) On occasion, appellate courts have reviewed orders, such as those sustaining a demurrer without leave to amend, "based upon justifications such as the avoidance of delay, the interests of justice, and the apparent intent of the trial court to have a formal judgment filed. [Citation.] And when the trial court has sustained a demurrer to all of the complaint's causes of action, appellate courts may deem

Academy timely appealed from the order denying its motion to compel arbitration.

## II. DISCUSSION

### A. The Goldberg Plaintiffs' Appeal

The Goldberg plaintiffs assert the trial court erred by (1) sustaining the demurrer on the basis they lacked standing to bring a claim for statutory penalties, and (2) striking allegations related to the discovery subclass. As we will explain, we affirm the trial court's order on demurrer and decline to reach the ruling on the Academy's motion to strike.

#### 1. Order Sustaining the Demurrer

The Goldberg plaintiffs contend the trial court erred because Code of Civil Procedure[5] sections 377.20 and 377.34 expressly allow for penal fines to survive a person's death. We disagree because neither the plain language of section 377.34 nor the legislative history support such an interpretation.

##### a. Standard of Review

This court recently summarized the relevant standard of review in *Kahan v. City of Richmond* (2019) 35 Cal.App.5th 721: " 'We review the ruling sustaining the demurrer de novo, exercising independent judgment as to whether the complaint states a cause of action as a matter of law.' [Citation.] ' "[W]e give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." ' [Citation.] 'When conducting this

---

the order to incorporate a judgment of dismissal, since all that is left to make the order appealable is the formality of the entry of a dismissal order or judgment." (*Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1396.) Accordingly, we interpret the order sustaining the demurrer as incorporating the subsequent final judgment entered against the Goldberg plaintiffs.

[5] All statutory references are to the Code of Civil Procedure unless otherwise noted.

independent review, appellate courts "treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law." ' [Citation.]

"Although we review the complaint de novo, ' "[t]he plaintiff has the burden of showing that the facts pleaded are sufficient to establish every element of the cause of action and overcoming all of the legal grounds on which the trial court sustained the demurrer, and if the defendant negates any essential element, we will affirm the order sustaining the demurrer as to the cause of action. [Citation.] We will affirm if there is any ground on which the demurrer can properly be sustained, whether or not the trial court relied on proper grounds or the defendant asserted a proper ground in the trial court proceedings." ' [Citation.] It is the trial court's ruling we review, not its reasoning or rationale. [Citations.]

"We also review questions of statutory interpretation de novo. [Citation.] 'We begin with the fundamental rule that our primary task is to determine the lawmakers' intent.' [Citation.] In determining that intent, ' "we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction." ' " (*Kahan v. City of Richmond, supra,* 35 Cal.App.5th at pp. 730–731.)

### b. Analysis

Rent Ordinance section 37.10B, subdivision (c)(5) allows for recovery of "money damages of not less than three times actual damages suffered by an aggrieved party (including damages for mental or emotional distress), or for statutory damages in the sum of one thousand dollars, whichever is greater." The SAC expressly states "[n]either Plaintiffs nor the Class . . . allege that any of them have ever suffered either 'tangible concrete injury' or 'intangible

9

concrete injury' " and only seeks an award of "penal fines."  Neither party contests the damages at issue involve penal fines.[6]  However, they disagree as to whether such damages survive Aaryn's death.

The Goldberg plaintiffs argue section 377.20 provides for survivability, and no statute provides otherwise.  Subdivision (a) of section 377.20 states: "Except as otherwise provided by statute, a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period."

The Academy contends (1) penal fines are not assignable and thus, under longstanding authority, are not survivable; and (2) section 377.34 limits the survivability of Aaryn's claim for statutory penalties under Rent Ordinance section 37.10B.

Undoubtedly, as the Academy notes, statutory penalties are not assignable.  (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1003.)  And, generally, claims that are not assignable do not survive the death of a party.  (*Estate of Blair* (1954) 42 Cal.2d 728, 731; *Jim 72 Props., LLC v. Montgomery Cleaners* (C.D.Cal. 2015) 151 F.Supp.3d 1092, 1097; Schwing & Carr, Cal. Affirmative Defenses (July 2020) § 17:10 ["As a general rule, subject to certain exceptions, causes of action that are not assignable during the life of the plaintiff are extinguished by the plaintiff's death; these causes of action cannot be transferred before or after death nor are they transferred as a matter of law by death."].)  However, "assignability of rights arising pursuant to statutory provision . . . is commonly governed by express statutory provisions."  (7 Cal.Jur.3d

---

[6] We are not deciding whether an award of "statutory damages in the sum of one thousand dollars," as provided in Rent Ordinance section 37.10B, subdivision (c)(5), constitutes an award of damages or a penalty.  Because all parties discuss this award as a penalty, we accept their characterization.

10

Assignments (Aug. 2020 Update) § 14.) And some statutes allow claims to survive death despite being nonassignable. (See, e.g., Lab. Code, § 4900 [worker's compensation claim is unassignable before payment, but that does not affect survival of the claim].) Accordingly, we must examine the relevant statutory scheme to determine whether penal fines survive Aaryn's death.

Section 377.34 addresses the scope of actions by successors in interest, stating in relevant part, "the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement."

"The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.) Here, the statute clearly allows estates to recover predeath economic damages. Likewise, it is clear estates are not allowed to recover predeath damages for pain, suffering, or disfigurement. At issue, however, is whether the statute allows estates to recover penalties unrelated to predeath economic damages. On this point, the statutory language is ambiguous. The phrase "including any penalties or punitive or exemplary damages" could be interpreted as penalties and punitive damages that are dependent on predeath economic damages. As noted by the parties, some penalties are tied to actual damages while others are not. (Compare Rent Ordinance, § 37.10B, subd. (c)(5) [providing in part "statutory damages in the sum of one thousand dollars"] with Civ. Code, § 1794, subd. (c) [providing "a civil penalty which shall not exceed two times the amount of actual damages"].) Alternatively, the phrase could have indicated the breadth of recoverable predeath "loss or damage" and be

11

interpreted as allowing all penalties and punitive damages, regardless of whether tied to economic loss, as part of the damages recoverable by estates. (See *Paramount Gen. Hosp. Co. v. National Medical Enterprises, Inc.* (1974) 42 Cal.App.3d 496, 501 ["The term 'includes' is 'ordinarily a word of enlargement and not of limitation.' "].)

In evaluating this ambiguity, we find *County of Los Angeles v. Superior Court* (1999) 21 Cal.4th 292 (*County of Los Angeles*) instructive.  There, the California Supreme Court discussed section 377.34 in the context of a federal civil rights action.  The court explained "under California's survival law, an estate can recover not only the deceased plaintiff's lost wages, medical expenses, and any other pecuniary losses incurred before death, but also punitive or exemplary damages." (*County of Los Angeles*, at p. 304; accord, *Williams v. The Pep Boys Manny Moe & Jack of California* (2018) 27 Cal.App.5th 225, 236.)  Conversely, the court noted, damages for pain, suffering, or disfigurement are expressly excluded.  (*County of Los Angeles*, at p. 304.)  The court noted when the Legislature was adopting the precursor statute to section 377.34,[7] it was presented with the Recommendation and Study Relating to Survival of Actions (Oct. 1960) 3 California Law Revision Commission Report (1961) (hereafter Recommendation Study) and an accompanying analysis:  the Recommendation Study argued for allowing

---

[7] In 1961, the Legislature amended its survivorship statutes and enacted Probate Code section 573.  (Stats. 1961, ch. 657, § 2, pp. 1867–1868 (1961 statute).)  The 1961 statute provided in relevant part:  "When a person having a cause of action dies before judgment, the damages recoverable by his executor or administrator are limited to such loss or damage as the decedent sustained or incurred prior to his death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had he lived, and shall not include damages for pain, suffering or disfigurement."  The language from the 1961 statute was then adopted verbatim when enacting section 377.34 in 1992.

recovery for pain, suffering, and disfigurement; the analysis argued against such recovery. (*County of Los Angeles*, at p. 296.) "The Legislature adopted the latter view." (*Id.* at p. 305.) The Supreme Court explained, "Essentially, the line drawn by the Legislature approximates the pecuniary out-of-pocket losses the deceased plaintiff experienced because of the defendant's unlawful behavior. These pecuniary losses, such as lost or reduced wages or expenses of medical care, actually reduced the plaintiff's income or increased the plaintiff's pecuniary expenses. If uncompensated, these pecuniary losses would reduce the value of the estate below what it would have been in the absence of the defendant's harmful conduct . . . . By contrast, when the plaintiff experiences emotional distress, the loss is nonpecuniary. Psychic injury, while it can be psychologically devastating, does not in itself reduce income or increase expenses. Therefore, psychic injury does not reduce the value of the plaintiff's estate compared to what it would have been in the absence of the injury, and the Legislature's decision not to allow the estate to recover damages for such injury was reasonable." (*Id.* at p. 305, fn. omitted.)

Implicit in the Supreme Court's analysis is the need for pecuniary loss to trigger imposition of any applicable punitive damages or penalties. "In California, as at common law, actual damages are an absolute predicate for an award of exemplary or punitive damages." (*Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147; accord, *Garcia v. Superior Court* (1996) 42 Cal.App.4th 177, 186 [noting estate could seek "at least nominal damages as a springboard for substantive punitive damages"].) Otherwise, imposing penalties unassociated with any actual damages does not address the Legislature's concern: a reduction of "the value of the estate below what it would have been in the absence of the defendant's harmful conduct." (See *County of Los Angeles*, *supra*, 21 Cal.4th at p. 305.)

13

The Goldberg plaintiffs, citing the Recommendation Study, argue the Legislature's purpose in adopting the 1961 statute was to allow punitive punishments—including all penalties—to survive a victim's death. They contend disinheriting penal fines would run contrary to the Legislature's intent to deter and punish tortfeasors.

We disagree with the Goldberg plaintiffs' interpretation of the Recommendation Study and find *County of Los Angeles* supports a different conclusion. The Recommendation Study, and the resulting statutory amendments, arose out of a concern regarding then-existing uncertainty as to the survivability of torts which do not cause physical injury or death. (Recommendation Study, *supra*, 3 Cal. Law Revision Com. Rep. at pp. F-5–F-6, F-19.) Its focus was not on survivability of penal fines, but rather what tort actions should survive. (*Ibid.*) The original revisions suggested only addressing survival of tort causes of action, but the Recommendation Study concluded it would be simpler to allow survival of all causes of action. (*Id.* at p. F-8.) In recommending survival of all causes of action, the Law Revision Commission (commission) explained, "A comprehensive survival statute would make little or no substantive change in the present law with respect to survival of non-tort causes of action." (*Ibid.*) Thus, the commission's intent was to not alter the status quo for purely statutory actions, such as the one at hand. And the commission believed there would be no meaningful impact to such claims. (*Ibid.*)

This understanding is further emphasized by the commission's discussion regarding the limitations for recovering damages. As to such limitations, the commission recommended as follows: "California courts have held that punitive or exemplary damages or penalties may not be recovered against the estate of a deceased wrongdoer. This limitation should be

14

continued. . . . [¶] The provision in the 1949 legislation that the right to recover punitive or exemplary damages is extinguished by the death of the *injured* party should not be continued.  There are no valid reasons for this limitation." (Recommendation Study, *supra*, 3 Cal. Law Revision Com. Rep. at p. F-7.)  While the commission recommended maintaining the bar against recovering punitive damages and penalties from a deceased wrongdoer, penalties are notably absent from its recommendation to now allow recovery of punitive damages by a successor to a deceased victim.  The only reasonable interpretation of these two sentences is that the commission was not recommending recovery of all penalties in the event of a victim's death.  And this interpretation is in accord with the Recommendation Study's broader statement that the proposed revisions "would make little or no substantive change in the present law with respect to survival of non-tort causes of action." (*Id*. at p. F-8.)

Here, we are presented with a nonpecuniary loss—penalties unassociated with any actual damages to Aaryn.  Such penalties have no bearing on "reduce[d] income or increase[d] expenses" incurred by Aaryn as a result of the Academy's conduct.  (See *County of Los Angeles*, *supra*, 21 Cal.4th at p. 305.)  While section 377.34 allows recovery of penalties and punitive damages attendant to any predeath pecuniary losses, we cannot conclude penalties are recoverable without such pecuniary losses.  Accordingly, the term "penalties" in section 377.34 is best interpreted as limited to only those relating to "loss or damage that the decedent sustained or incurred before death."[8]  (See § 377.34.)  The trial court thus did not err in sustaining the demurrer to the first cause of action.

---

[8] The Goldberg plaintiffs rely on section 340, subdivision (a) to argue the term "penalties" necessarily includes those based and not based on actual loss.  However, section 340, subdivision (a) has no bearing on section 377.34

15

## 2. *Order Granting in Part the Motion to Strike*

The Goldberg plaintiffs next contend the trial court erred by striking allegations related to the discovery subclass.  They contend class members can prove delayed discovery by way of the common course of conduct doctrine.  In response, the Academy asserts the order is not appealable because it is unrelated to the trial court's order sustaining the demurrer.  The Academy alternatively argues the trial court properly concluded delayed discovery could not be proven on a class-wide basis, and the SAC failed to adequately plead such tolling.

At the request of this court, the parties submitted supplemental briefs regarding whether we should address the motion to strike if we upheld the demurrer ruling.  The Goldberg plaintiffs argued this court should reach the motion to strike because, if this court declined to do so, the strike order would become final as against the discovery subclass.  Because of this risk, the Goldberg plaintiffs argue this court should invoke an exception to mootness for instances " 'when a material question remains for the court's determination.' "  The Academy argues the strike order is only appealable by the Goldberg plaintiffs, and if they are no longer parties to the action then this court should not reach the ruling on the motion to strike because it would have no material impact on them.  The Academy notes the remaining plaintiffs can continue to litigate any outstanding issues, and no exception to mootness applies.

As an initial matter, we conclude the motion is appealable as to the Goldberg plaintiffs.  The Academy relies on *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, which concluded "nonappealable

---

and lacks the language contained in section 377.34 that limits recoverable damages to "loss or damage . . . sustained or incurred before death."

16

orders or other decisions substantively and/or procedurally collateral to, and not directly related to, the judgment or order being appealed are not reviewable pursuant to section 906 even though they literally may 'substantially affect[ ]' one of the parties to the appeal." (*Id.* at p. 948.) However, *Cahill* was later distinguished in *In re A.L.* (2014) 224 Cal.App.4th 354. In that matter, the court noted *Cahill* "involved an appeal from an appealable order that was *not* the final judgment." (*A.L.*, at p. 362, fn. 4.) The court explained the case before it involved an "appeal . . . from the disposition—the equivalent of the final judgment in the case. If A.L. cannot obtain review of the order now, on appeal from the final judgment, she can never obtain review of an order that substantially affects her rights. In our view, Code of Civil Procedure section 906 on its face clearly provides otherwise." (*Ibid.*)

We find *In re A.L.* persuasive for the principle that orders partially granting a motion to strike are typically reviewable in connection with an appeal from a final judgment. (§ 472c, subds. (b)(3), (c).) Here, the Goldberg plaintiffs' appeal is from a final judgment, and interpreting section 906 narrowly under the circumstances would prohibit them from seeking review of the strike order. Such a result would not be consistent with the language of section 906, which specifically allows for the review of intermediate rulings and orders in an appeal following a final judgment.

However, we need not reach the validity of the strike order because the Goldberg plaintiffs lack standing to assert their claim for statutory penalties. (See part II.A.1.b., *ante*.) The motion to strike has no bearing on the Goldberg plaintiffs' standing to bring their claim for relief, and it does not impact our affirmance of the judgment against them. Because they lack standing to pursue their claim against the Academy, we can provide them

17

with no effective relief as to the motion to strike. (*Schoshinski v. City of Los Angeles* (2017) 9 Cal.App.5th 780, 791 [" ' "Generally, courts decide only 'actual controversies' which will result in a judgment that offers relief to the parties." ' "].)

The Goldberg plaintiffs assert an exception to mootness applies, namely, "when a material question remains for the court's determination. [Citation.] . . . [because] 'the judgment, if left unreversed, would preclude a party from litigating . . . an issue still in controversy.' " (*Hensley v. San Diego Gas & Electric Co.* (2017) 7 Cal.App.5th 1337, 1346, fn. 4.) The Goldberg plaintiffs claim the strike order would become final as to the discovery subclass. However, this concern only arises if the Goldberg plaintiffs were the sole representatives of the discovery subclass. But they are not. The SAC expressly states, "Plaintiffs are *all* members of the Discovery Sub-Class." (Italics added.) The SAC further states the term "plaintiffs" collectively refers to Bassler, Goldberg, Kuckuk, and Stanfield. While the strike order operated to limit the scope of the class based on the date the class members executed housing license agreements with the Academy, the class claims continue to be part of the operative SAC. Accordingly, Bassler and Stanfield, who also have been identified in the SAC as members of the discovery subclass, remain able to challenge the strike order and pursue the interests of that subclass.

We recognize the inherent challenge in our conclusion. Bassler and Stanfield are currently unable to appeal the trial court's order.[9] They are not subject to a final judgment, and the order, by itself, is not appealable. (See *In*

---

[9] Without opining on the success of such an approach, we also note "an interlocutory order is reviewable by way of a petition for writ of mandate." (*In re Cipro Cases I & II* (2004) 121 Cal.App.4th 402, 409.) However, no such petition was pursued by Bassler or Stanfield.

18

*re Baycol Cases I & II* (2011) 51 Cal.4th 751, 757–758 ["orders that only limit the scope of a class or the number of claims available to it are not similarly tantamount to dismissal and do not qualify for immediate appeal under the death knell doctrine; only an order that entirely terminates class claims is appealable"].)

To argue a mootness exception still applies, the Goldberg plaintiffs assert orders denying class certification cause a retroactive loss of tolling rights, citing *Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276. But that case is inapposite. In *Fierro*, the Fourth Appellate District addressed whether a class action, culminating with denial of class certification, would toll the applicable statute of limitations as to a successive class action asserting the same claim. (*Id.* at p. 289.) The appellate court concluded only individual claims were tolled during the pendency of the class action. (*Id.* at p. 292.)

Here, there is no denial of class certification—only an order limiting the scope of the class. And that order has not become final for the remaining plaintiffs as discussed above. The remaining class representatives may continue to advocate for the interests of the class and litigate the proper scope of that class.[10]

## B. The Academy's Appeal

The Academy, in its appeal, contends the trial court erred in denying its motion to compel arbitration. It contends the arbitration clause in the enrollment agreement, which covers "[a]ny controversy or claim arising out of or relating to" the enrollment agreement, encompasses extracontractual and

---

[10] While we do not opine on the issue, we note the Goldberg plaintiffs cite no authority to suggest members of the stricken discovery subclass, if they remain excluded from the class, could not file individual claims against the Academy.

statutory disputes provided " 'they have their roots in the relationship between the parties which was created by the contract.' "  While we agree the enrollment agreement contains a broad arbitration provision, we disagree that provision encompasses the current dispute and affirm the order.

### 1.  *Standard of Review*

This court recently summarized the relevant standard in *Ramos v. Superior Court* (2018) 28 Cal.App.5th 1042:  "[U]nder both state and federal law, there is a strong policy favoring arbitration.  [Citation.]  Any doubts concerning the scope of arbitrable issues will be resolved in favor of arbitration.  [Citations.]  ' " ' "A heavy presumption weighs the scales in favor of arbitrability; an order directing arbitration should be granted 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage.' " ' " '  [Citation.]

"In deciding whether the parties agreed to arbitrate their dispute, we apply state rules of contract interpretation to evaluate whether the parties objectively intended to submit the issue to arbitration.  [Citations.]  'When conflicting extrinsic evidence was not offered below, we apply a de novo, or independent, standard of review on appeal from a trial court's determination of whether an arbitration agreement applies to a particular controversy.' "  (*Ramos v. Superior Court, supra*, 28 Cal.App.5th at p. 1051.)

### 2.  *Analysis*

The arbitration provision in the enrollment agreement applies to "Any controversy or claim arising out of or relating to this [enrollment] agreement, breach of this agreement, or termination . . . ."  The phrase "arising out of or relating to" is necessarily qualified by the subsequent phrase "this agreement, breach of this agreement, or termination."  Giving the words of

the contract their plain meaning, the arbitration clause requires the parties to arbitrate any dispute or controversy "arising out of or related to" the enrollment agreement. (See, e.g., *Rice v. Downs* (2016) 248 Cal.App.4th 175, 187 ["The parties did not simply agree to arbitrate 'any controversy,' effectively meaning every controversy between them. 'Any controversy' is necessarily modified by 'arising out of this Agreement.' "].) Accordingly, the question is whether the parties' dispute regarding the housing license agreement "aris[es] out of" or "relate[s] to" the enrollment agreement.

On this point, the Academy argues student housing, accessed through execution of a housing license agreement, is only available to students who executed enrollment agreements. Thus, the Academy asserts, the plaintiffs would not have claims without executing the enrollment agreements.

" ' "[T]he decision as to whether a contractual arbitration clause covers a particular dispute rests substantially on whether the clause in question is 'broad' or 'narrow.' " ' [Citation.] Clauses providing for arbitration of disputes ' "arising from" ' or ' "arising out of" ' an agreement have generally been interpreted to apply only to disputes regarding the interpretation and performance of the agreement. [Citations.] On the other hand, arbitration clauses (like the one in this case) that use the phrase 'arising under *or related to*' (italics added) have been construed more broadly. [Citations.] For a party's claims to come within the scope of such a clause, the factual allegations of the complaint 'need only "touch matters" covered by the contract containing the arbitration clause.' [Citations.] Further, courts have interpreted agreements with broad arbitration clauses like the one in this case to encompass tort, statutory, and contractual disputes that ' " 'have their roots in the relationship between the parties which was created by the

21

contract.' " ' " (*Ramos v. Superior Court*, *supra*, 28 Cal.App.5th at pp. 1051–1052.)

Certainly, the only individuals who would sign housing license agreements are students enrolled at the Academy (and thus have executed enrollment agreements). However, enrolled students were not required to also execute housing license agreements, and not all students were offered such agreements. The question thus is whether the dispute "has its roots" in the enrollment agreement, or whether it arises solely from the housing license agreements.

We are unaware of any authority involving our current scenario—i.e., multiple contracts, only one of which contains an arbitration provision, in the educational context. Nor are we aware of relevant California authority on this issue. However, we find instructive those cases outside of the education context that discuss whether an arbitration provision in an initial contract may apply to a subsequent contract lacking such a provision. In *Rosenblum v. Travelbyus.com Ltd.* (7th Cir. 2002) 299 F.3d 657, the plaintiff sold his business and, at the time of the sale, executed an employment agreement to continue working at his former company. (*Id.* at p. 659.) The employment agreement contained a broad arbitration clause, and the acquisition agreement did not mandate arbitration. (*Id.* at pp. 660–661.) The plaintiff sued under the acquisition agreement, and the district court granted the defendant's motion to compel arbitration based on the employment agreement. (*Id.* at p. 661.) On appeal, the Seventh Circuit identified two possible scenarios mandating an obligation to arbitrate: (1) if the "arbitration clause is broad enough, by its own terms, to encompass disputes under the [other contract]"; or (2) if the other agreement incorporates the agreement containing the arbitration provision "by reference." (*Id.* at p. 662.) The

22

Seventh Circuit concluded the arbitration clause "simply does not purport to cover the acquisition issues that form the basis of [the plaintiff's] claims" because the clause "applies, by its terms, to 'any matter in dispute under or relating to *this* [employment agreement.]'" (*Id.* at p. 664.) Other courts have followed similar guidelines for determining when an arbitration clause may encompass a later agreement. (See, e.g., *Nestle Waters N. Am., Inc. v. Bollman* (6th Cir. 2007) 505 F.3d 498, 505 ["if an action can be maintained without reference to the contract or relationship at issue, the action is likely outside the scope of the arbitration agreement"].)

Similarly, in *Goodrich Cargo Systems v. Aero Union Corp.* (N.D.Cal. Dec. 14, 2006, No. C 06-06226 CRB) 2006 WL 3708065, the plaintiff agreed to purchase a business from the defendant and executed an asset purchase agreement. (*Id.* at p. *1.) As an attachment to that agreement, the parties appended a manufacturing license agreement, "[t]he purpose of [which] was to create a licensing arrangement such that Defendant would continue to operate a portion of the [business]." (*Ibid.*) The plaintiff brought claims under both agreements, and the defendant moved to compel arbitration of all claims even though only the license agreement contained an arbitration clause. The defendant argued the two agreements "were executed together as part of an integrated business transaction and [thus] the [manufacturing licensing agreement]'s binding arbitration clause . . . encompasses any disputes related to that business transaction." (*Id.* at p. *2.) The court disagreed. It explained, "Just because the parties enacted multiple agreements in connection with the acquisition of the [business] does not mean that this Court may ignore the fact that there are discrete agreements pertaining to different facets of the transaction." (*Ibid.*) It noted the parties executed two distinct agreements, one of which governed acquisition of

23

certain assets, and the other governed a licensing arrangement that allowed the defendant to continue operating a portion of the business. (*Ibid*.) Because only the licensing agreement contained an arbitration clause, the court concluded the clause only applied to disputes related to those aspects of the transaction covered by the licensing agreement. (*Ibid*.)

The Academy does not contend the housing license agreement expressly incorporated the enrollment agreement. And it clearly does not do so. We thus must consider whether the arbitration provision in the enrollment agreement is broad enough, by its own terms, to encompass disputes under the housing license agreement. (See *Rosenblum v. Travelbyus.com Ltd.*, *supra*, 299 F.3d at p. 662; *Pitta v. Hotel Asso. of New York City, Inc.* (2d Cir. 1986) 806 F.2d 419, 422 [subsequent contract without arbitration provision subject to arbitration if it "supplement[s] an earlier 'umbrella' agreement containing such a clause"]; *S.A. Mineracao Da Trindade-Samitri v. Utah International, Inc.* (2d Cir. 1984) 745 F.2d 190, 195 [arbitration provision may apply where the later agreements were "expressly contemplated and provided for" in the earlier agreement].)

The Academy appears to suggest the arbitration provision covers any extracontractual or statutory dispute between the parties provided it has some connection to the university-student relationship. But the provision, while broad, is not so broad. Rather, it is limited to claims arising from or relating to the enrollment agreement, breach of the enrollment agreement, or termination as a student. The enrollment agreement covers a range of issues relating to matriculation such as coursework, tuition, fees, and withdrawal from the Academy. And any claims related to those issues would reasonably be subject to arbitration. Housing, however, is not related to a student's coursework, tuition, or matriculation. Many students enroll in the Academy

24

but do not execute housing license agreements. And plaintiffs' statutory challenge to the housing license agreements "can be maintained without reference to" the enrollment agreement, thus indicating the claim is "outside the scope of the arbitration agreement." (See *Nestle Waters N. Am., Inc. v. Bollman*, *supra*, 505 F.3d at p. 505.)

The cases cited by the Academy do not compel a different conclusion. In *Esquer v. Edu. Mgmt. Corp.* (S.D.Cal. 2017) 292 F.Supp.3d 1005, the plaintiff signed an enrollment agreement requiring arbitration of any dispute "arising out of or relating to a student's enrollment or attendance at The Art Institute." (*Id.* at p. 1009.) The plaintiff's claims were regarding alleged disclosure of private personal facts during classes, and the court concluded such allegations directly related to his "attendance" at the school. (*Id.* at p. 1017.) Similarly, in *Gragg v. ITT Technical Institute* (C.D.Ill. Feb. 29, 2016, No. 14-3315) 2016 WL 777883, the plaintiffs alleged ITT Technical Institute (ITT Tech) failed to accommodate their disabilities when taking classes at the school, they were discriminated against in those classes, and they were punished when they failed classes as a result of no accommodations. (*Id.* at p. *1.) The plaintiffs signed enrollment agreements, which contained an arbitration provision requiring arbitration " 'of any dispute arising out of or in any way related to' " the enrollment agreement. (*Id.* at p. *3.) The court concluded their discrimination claims were subject to arbitration because they arose "from the services provided by ITT Tech to the Graggs as a part of the Graggs' enrollment and, therefore, arises from the Enrollment Agreement." (*Ibid.*)

These cases merely stand for the proposition that claims arising from classes and activities related to students' matriculation are subject to

arbitration provisions contained in enrollment agreements.[11]  We do not disagree with these holdings.  Here, however, the claim at issue does not relate to the Academy's educational program or matriculation.  Rather, it relates to whether the Academy misrepresented housing rights arising from separate housing license agreements.  Accordingly, the trial court did not err in concluding the first cause of action was outside the scope of the arbitration provision in the enrollment agreement.[12]

### III.  DISPOSITION

The judgment as to Bennett Goldberg and Linda Kuckuk is affirmed. The trial court's order denying the Academy's motion to compel arbitration is

---

[11] The other cases cited by the Academy also involve claims directly related to enrollment, participation in the academic program, and/or matriculation.  (See, e.g, *Ferguson v. Corinthian Colleges, Inc.* (9th Cir. 2013) 733 F.3d 928, 938 [complaint regarding misrepresentation of the value and cost of education subject to arbitration provision covering any disputes arising from enrollment]; *Okwale v. Corinthian Colleges* (D.Utah Feb. 19, 2015, No. 1:14-cv-135-RJS) 2015 WL 730015, pp. *1–*2 [complaint alleging plaintiff was fraudulently induced to enroll in nursing program and subject to discrimination during program subject to arbitration provision covering " 'any dispute arising from [plaintiff's] enrollment' "]; *Daniels v. Virginia College at Jackson* (5th Cir. 2012) 478 Fed.Appx. 892, 893 [arbitration provision, which covered "any claim 'arising out of or relating to [the Agreement]' " or " 'arising out of or in relation to [the plaintiff's] enrollment and participation in courses at the College,' " encompassed claim that college unlawfully retained a portion of her financial aid money]; *Sanders v. Concorde Career Colleges, Inc.* (D.Ore. Mar. 16, 2017, No. 3:16-cv-01974-HZ) 2017 WL 1025670, p. *3 [court noted "Plaintiff's claims as alleged in the Complaint arise from her enrollment with Defendants" and thus were covered by the arbitration provision in the enrollment agreement].)

[12] Because we conclude the claim is outside the scope of the arbitration provision, we do not reach the question of whether the arbitration provision is valid.

26

also affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)

_____
Margulies, J.

We concur:

_____
Humes, P. J.

_____
Banke, J.

A156949
*Goldberg v. Stephens Institute*